## BOSTON STORE OF CHICAGO *v.* AMERICAN GRAPHOPHONE COMPANY ET AL.

### CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

No. 363.  Argued January 16, 1918.—Decided March 4, 1918.

Certificates of the facts constituting the basis for questions propounded to this court by the Circuit Court of Appeals should be prepared with care and precision.

Where the bill in the District Court claimed protection for a price-fixing contract under the patent laws, and the want of merit in the claim was not so conclusively settled by decision when the bill was filed as to make the claim frivolous, the court had jurisdiction to pass upon the case as made by the bill, that is, to determine whether the suit arose under those laws.

Where a patent owner delivers patented articles to a dealer by a trans-
action which, essentially considered, is a completed sale, stipulations
in the contract that the articles may not be resold at prices other
or lower than those fixed presently and from time to time by the
patent owner are void under the general law, and are not within the
monopoly conferred, or the remedies afforded, by the patent law.

Recent decisions of this court denying the right. of patent owners, in
selling patented articles, to reserve control over the resale or use
were not rested upon any mere question of the form of notice attached
to. the articles or the right to contract solely by reference to such
notice, but upon the fundamental ground that the control of the
patent owner over the articles in question ended with the passing
of title.

The courts must needs apply the patent law as they find it; if this
result in damage to the holders of patent rights, or if the law afford
. insufficient protection to the inventor, the remedy must come from
Congress.

THE case is stated in the opinion.

*Mr. Walter Bachrach* and *Mr. Hamilton Moses,* with
whom *Mr. Joseph W. Moses* was on the briefs, for Boston
Store of Chicago.

*Mr. Elisha K. Camp, Mr. Daniel N. Kirby* and *Mr.
James M. Beck,* with whom *Mr. Gilbert H. Montague* was
on the briefs, for American Graphophone Co. *et al.:*

Whether or not a patentee, in dealing with his monopoly
right to sell, owns or retains title to the physical article,
is not conclusive as to his intent in disposing of his monop-
oly right to sell. He may conditionally dispose of the
right to sell, even though he had or has no title to the
article itself. *Bement* v. *Harrow Co.,* 186 U. S. 70, 88, 91,
92, 93. The principle decided in the *Bement Case* also
supports the proposition that a conditional sale of the
article, subject to a reserved part of the monopoly right
to sell, rests upon the patent laws. That case was not
modified by the later cases. Thus, *Bobbs-Merrill Co.* v.
*Straus,* 210 U. S. 339, was limited to an effort to enforce

a price restriction by "mere notice." Likewise, *Henry* v. *Dick Co.*, 224 U. S. 1; *Motion Picture Co.* v. *Universal Film Co.*, 243 U. S. 502; and *Bauer* v. *O'Donnell*, 229 U. S. 1. *Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373, involved no question of patent law.

The fact that the gross money consideration was paid is not conclusive, but is merely one of the evidential facts to be considered, in determining the ultimate fact, the intent. The future observance by the licensee or purchaser, of the restrictions on resale expressed in the agreement, was of far greater value to the patentee than the money consideration. The mere fact that there is a contract between the patentee and his grantee does not force the conclusion that his right and remedy rest solely upon contract, and not at all upon the patent law, if the subject-matter of the contract consists in part of a monopoly right which is also the subject-matter of the suit.

The contract was not violative of the Sherman Act or contrary to public policy. *Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373; *Great Atlantic & Pacific Tea Co.* v. *Cream of Wheat Co.*, 224 Fed. Rep. 566, 568; *United States* v. *Quaker Oats Co.*, 232 Fed. Rep. 499, 502; *Phillips* v. *Iola Portland Cement Co.*, 125 Fed. Rep. 593; *Ford Motor Co.* v. *Benjamin E. Boone, Inc.*, 244 Fed. Rep. 335; *Grogan* v. *Chaffee*, 156 California, 611; *Ghirardelli* v. *Hunsicker*, 164 California, 355; *Fisher Flouring Mills* v. *Swanson*, 76 Washington, 649; *United States* v. *Addyston Pipe & Steel Co.*, 85 Fed. Rep. 271, 281–283; *Park & Sons Co.* v. *Hartman*, 153 Fed. Rep. 24; *Bobbs-Merrill Co.* v. *Straus*, 210 U. S. 339; *Bauer* v. *O'Donnell*, 229 U. S. 1. The rule against restraints upon alienation, so far at least as concerns so-called resale price arrangements affecting articles in interstate commerce, is merged in the comprehensive prohibitions of the Sherman Act. *Standard Oil Co.* v. *United States*, 221 U. S. 1, 49–64; *United States* v. *American Tobacco Co.*, 221 U. S. 106, 178–181. The rule

is against limitations and qualifications upon the property interest, the title, of the purchaser and sub-purchasers of the article; and, so far as concerns the contractual capacity of the vendor, the rule does not operate except against attempts by contract to control sub-purchasers as distinguished from purchasers; and even when thus limited and qualified, the rule does not apply to certain articles whose acquired, intangible attributes distinguish them commercially from similar commodities in the same line of commerce. This and other federal courts have held that trading stamps and railroad tickets are sound exceptions to the rule against restraints upon the alienation of personal property. *Park & Sons Co.* v. *Hartman,* 153 Fed. Rep. 24, 31; *Bitterman* v. *Louisville & Nashville. R. R. Co.,* 207 U. S. 205, 222; *Sperry & Hutchinson Co.* v. *Mechanics' Clothing Co.,* 128 Fed. Rep. 800; *Sperry & Hutchinson Co.* v. *Weber & Co.,* 161 Fed. Rep. 219. Neither the Sherman Act nor public policy is offended by an arrangement in the nature of so-called resale price maintenance in any particular case where there is an absence of monopolistic features, and where preëminent good will attaches to and is conveyed with the article, and where the arrangement is limited to the requirements and necessities of this good will, and to the manufacturer's immediate vendee with whom the manufacturer is in direct contractual relation.

*Mr. James M. Beck,* for American Graphophone Co. *et al.,* filed a separate argument on the question whether a contract of sale, which imposes upon the vendor's immediate vendee a resale price, necessarily and under all circumstances, is invalid. All that was necessarily decided in *Dr. Miles Medical Co.* v. *Park & Sons Co.,* 220 U. S. 373, was that where an article of commerce was absolutely monopolized by a given producer, and where therefore no competitive conditions existed in that line of commerce to protect the

consumer, and where the producer, being thus an absolute monopolist, imposed upon all distributors and retailers an interlocking system of contracts, which made competition in prices an impossibility,—that such producer could not, as against one who sustained no contractual relation whatever to the producer, compel him to submit to such price maintenance system. If the contract in a given case is not clearly prejudicial to the public welfare, then the presumptive right of the contracting parties "to do as they will with their own" should be respected. The erroneous idea that any restraint upon the alienation of personal property was void at common law arose out of a misconception of a passage from Coke on Littleton, § 360. Coke, in the context of this very passage, however, and Littleton, in the section of his *Tenures*, on which it is based, both stated that the rule referred only to total restraints upon every mode of alienation, and did not include restraints that were not total, or that left free some right of alienation—like the conditions of the agreement certified in the present case, for instance.

The decision of *Mitchell* v. *Reynolds*, 1 P. Wms. 181 (1711), and all subsequent cases, simply recognized the common law, and the only change of doctrine was the growing recognition by the courts that all restraints upon alienation, growing out of contract, should be recognized as within the fair rights of the contracting parties, unless such restraints were clearly prejudicial to the public welfare. *Standard Oil Co.* v. *United States*, 221 U. S. 1; *United States* v. *American Tobacco Co.*, 221 U. S. 106, 179.

As the legal test of a contract is the public welfare, it inevitably follows that the judicial declaration of public policy must conform to changing economic conditions. *Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 406; *Tuttle* v. *Buck*, 107 Minnesota, 145; *Diamond Match Co.* v. *Roeber*, 106 N. Y. 473.

Applying these considerations to the precise question now under consideration, it is obvious that when a vendor sells a commodity of commerce to a vendee, upon condition that he shall not resell the article at less than a minimum price, no general or absolute restraint of alienation exists. Unless it is plain that such a contract is prejudicial to the public welfare, it must be sustained as within the constitutional rights of both vendor and vendee. In determining this question, this court must recognize that there is a wide variety of circumstances under which such restrictions are imposed. The article may be a necessity of life, or, as in the case at bar, a mere luxury. It may be sold under competitive conditions or, as in the *Miles Medical Case*, under non-competitive conditions. To prevent misconstruction, we do not concede that public policy should solely regard the interests of the consumer. Nevertheless the consumer, especially when necessaries of life are involved, must be a matter of first and chief consideration. Public policy, however, must necessarily take into account the retailer, the distributor and especially the producer, for if the producer cannot economically produce, the consumer must suffer a total deprivation of the product. Where competitive conditions exist (as here), the inevitable working of economic laws protects the consumer not only in giving him the opportunity, if he thinks the resale price unfair, to purchase a competing product, but also because the existence of competitive conditions normally affects the reasonableness of the resale price. No one questions the right of the producer to establish his own depots for the marketing of his products, and in that event to charge the consumer what price he pleases. If he have not sufficient capital to establish his own marketing depots, he can at least consign his goods to his own agents with a similar result. It is well known that either the chain store or the consignment plan is far more expensive than the distribution of a product through dis-

tributors and retailers.   It inevitably follows that if the public policy of the nation, as declared by statute or judicial decision, should unreasonably interfere with the right of contract in the matter of resale prices, the strongest producers will, as in the case of the Standard Oil and other great concerns, be driven to market their own products. The result will be that the consumer will not only pay as much but, other things being equal, he will pay more for his product, because upon him the burden of increased expenses generally falls.   Thus the small producers may be driven out of business and only the large producers remain; and this inevitably will tend towards partial monopolization.   Even if competition in prices is the only element to be considered, the reasonableness even from the standpoint of the consumer of resale prices must depend upon the existence or nonexistence of competitive conditions, and this in itself shows the danger of holding too broadly and rigidly that all such contracts are void.   Under modern commercial methods, where the manufacturer of a commodity, not a necessary of life, must often create the market for his wares, not only for himself but for his distributors and retailers, it is obviously impossible for the manufacturer to sell his goods, and after taking his price give no further attention to them.   The immense and continuing service in developing and maintaining the value of the product in the present case is no part of any contract of sale between the manufacturer and his immediate vendee.   It is a gratuitous service, so far as any contractual obligation is concerned.   The manufacturer could withhold it, and if he did, his business, and that of his distributors and retailers, would sooner or later dwindle. It does not follow that the public necessarily pays a larger price.   The more phonographs and records sold, the less the overcharge and the greater the ability of the manufacturer to develop the business.   We simply maintain that when a manufacturer has created the demand for an

article, and at great expense is aiding his vendee in finding a market, it is not unreasonable, but is consonant with the soundest business methods for him, as the owner of the article, to provide that his immediate vendee, who might otherwise be unable to sell the article, shall not, by cutting prices, make it impossible for the manufacturer to extend him that aid. *McLean* v. *Fleming*, 96 U. S. 245.

There is another and very important consideration. In the great centers of population, department stores, chain stores, and mail order houses have come into existence, unknown in Coke's time. The department store to attract custom often sells a standardized product at less than cost in order to gain a profit by the probable purchase of other articles at a large profit. No trade method is more reprehensible or more restrictive of honest business. Sooner or later the department store to a very substantial degree restrains trade by destroying its competitors, and, with the elimination of many competitors, the demand for the manufacturer's product quickly dwindles, and with a lessened demand, his power to expand commerce by increasing the demand for his products is necessarily destroyed. In this connection the court should apply the doctrine of the so-called "unfair trade" cases, i. e., cases involving fraudulent or unfair efforts to violate common-law trade-names as distinguished from technical trade-marks. It should recognize the existence of a twilight zone between the policy of unlimited price restriction through mere notice and the policy of a partial price restriction through the right of contract, not by creating a new law but by recognizing the fundamental liberty to make a reasonable contract and the rule of common law, which only forbade a complete restraint on alienation. That agreements in respect of so-called resale price maintenance should be sustained unless affirmatively shown to be in derogation of public policy has been held in other jurisdictions. Among many cases can be cited *Grogan* v.

*Chaffee*, 156 California, 611; *Ghirardelli* v. *Hunsicker*, 164 California, 355; *Commonwealth* v. *Grinstead*, 111 Kentucky, 203; *Weiboldt* v. *Standard Fashion Co.*, 80 Ill. App. 67; *Garst* v. *Harris*, 177 Massachusetts, 72; *Garst* v. *Hall & Lyon Co.*, 179 Massachusetts, 588; *Garst* v. *Charles*, 187 Massachusetts, 144; *Rackemann* v. *River Bank Improvement Co.*, 167 Massachusetts, 1; *Clark* v. *Frank*, 17 Mo. App. 602; *Walsh* v. *Dwight*, 58 N. Y. Supp. 91; *Fisher Flouring Mills Co.* v. *Swanson*, 76 Washington, 649. The English courts have reached the same conclusion. *Elliman Sons & Co.* v. *Carrington Sons, Ltd.* (1901), 2 Ch. Div. 275; *National Phonograph Co., Ltd.*, v. *Edison-Bell &c. Phonograph Co., Ltd.* (1908), 1 Ch. Div. 335.

Public policy requires this liberty of contract. *Printing Company* v. *Sampson*, 19 Eq. Cas., L. R. 462.

*Mr. J. Edgar Bull*, by leave of court, filed a brief on behalf of Thomas A. Edison, Inc., as *amicus curiæ*.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

The court below before whom this case is pending, desiring instruction to the end that the duty of deciding the cause may be performed, has certified certain facts and propounded questions for solution arising therefrom. The certificate as to some matters of procedure is deficient in specification and looked at from the point of view of the questions which it asks is somewhat wanting in precision. As, however, the matters not specified are not in dispute and the want of precision referred to is not so fundamental as to mislead or confuse, we are of opinion the duty rests upon us to answer the questions and we come to discharge it, making the statements, however, which we have made as an admonition concerning the duty not to be negligent and ambiguous but to be careful

and precise in preparing certificates as the basis for questions propounded to obtain our instruction.

Without in any degree changing, we re-arrange and somewhat condense the case as stated in the certificate. The American Graphophone Company, a West Virginia corporation, as assignee of certain letters patent of the United States, was the sole manufacturer of Columbia graphophones, grafonolas, records and blanks; and the Columbia Graphophone Company, also a West Virginia corporation, was the general agent of the American Company for the purpose of marketing the devices above stated.

"The American Company, acting through its agent, the Columbia Company, employs in the marketing of its phonographic records and its other products a system of price maintenance, by which system it has been its uniform practice to cause its agent, the Columbia Company, to enter into . . . contracts . . . in the name of the Columbia Company, with dealers in phonographic records, located in the United States and its territorial possessions, to whom the American Company delivers its product, through the Columbia Company, by which it is provided, in part, that in consideration of the prices at which prescribed quantities of the various said products of the American Company are agreed to be delivered to such dealer, the dealer, in turn, obligates himself or itself in selling such products to adhere strictly to and to be bound by and not to depart from the official list prices promulgated from time to time by the Columbia Company for said products, and further expressly covenants not in any way to dispose of any such products at less than such list prices. The American Company fixes and prescribes the prices of its said products, and said contracts when entered into cover all such products of the American Company which may thereafter from time to time be acquired by such dealers from the Columbia Company, without

any new express price restriction contract being entered into at the time when each order for goods subsequent to the entering into of said contract is placed or filled by said dealers.

"In pursuance of said price maintenance system the Columbia Company, acting under said instructions and as the agent of the American Company, entered into [such] contracts with over five thousand dealers in phonographic records located in the United States and its territorial possessions."

The Boston Store, an Illinois corporation established at Chicago, dealt with the American Company through its agent, the Columbia Company, conformably to the system of business which was carried out as above stated. The contract evidencing these dealings, which was typical of those by which the business system was carried on, was entered into in October, 1912, and contained the following clauses:

"No Jobbing Privileges Extended under this
Contract.
"*Notice to Purchasers of 'Columbia' Graphophones,
Grafonalos, Records, and Blanks.*

"All 'Columbia' Graphophones, Grafonolas, Records and blanks are manufactured by the American Graphophone Company under certain patents and licensed and sold through its sole sales agent the Columbia Phonograph Company (General), subject to conditions and restrictions as to the persons to whom and the prices at which they may be resold by any person into whose hands they come. Any violation of such conditions or restrictions make [s] the seller or user liable as an infringer of said patents.

"After reading the foregoing notice and in consideration of current dealers' discounts given to me/us by the Columbia Phonograph Company (General) I/we Hereby

Agree to take any Columbia product received by me/us from said company, either directly or through any intermediary, under the conditions and restrictions referred to in said notice and to adhere strictly and be bound by the official list prices established from time to time by said Company and that I/we will neither give away, sell, offer for sale, nor in any way dispose of such goods, either directly or through any intermediary, at less than such list prices, nor induce the sale of such goods by giving away or reducing the price of other goods, nor sell or otherwise dispose of any of said goods, directly or indirectly, outside of the United States, and I/we understand that a breach of this agreement will amount to an infringement of said patents and subject me/us to a suit and damages therefor. I/We admit the validity of all patents under which said product is manufactured and hereby covenant and agree not to question or contest the same in any manner whatsoever. I/We further understand and agree that this license extends the right to market said Columbia product from the below mentioned address only, and that a separate contract is required to market said product from a branch store or stores, or through an agent or agencies at any other point.

"I/We acknowledge the receipt of a duplicate of the foregoing notice and contract and that no representations or guarantees have been made by the salesman on behalf of said Company which are not herein expressed. I/We also acknowledge receipt of the official list prices on all Columbia product [s] in force at the date hereof."

This contract contained a note specifying large rates of discount from the list prices for purchases made under its terms, and contained a reference to other lists of net prices covering particular transactions and to the "current Columbia catalogues for list prices on machines, records and supplies."

Under this contract at the time and also subsequent to

its making the Columbia Company delivered to the Boston Store at Chicago a number of graphophones and appliances made by the American Company at the sums fixed in the contract as above stated. This suit arose from a disregard by the Boston Store of the rule as to maintenance of price fixed in its contract, that is, from selling the articles at a less price than that which the contract stipulated should be maintained, and the bill was filed against the Boston Store by the American and Columbia Companies to enjoin the alleged violations of the contract. While the certificate is silent as to the averments of the bill, in the argument it is stated and not disputed that it was based on a right to make the contract for the maintenance of prices in and by virtue of the patent laws of the United States and the resulting right under such laws to enforce the agreement as to price maintenance as part of the remedy given by the patent law to protect the patent rights of the American Company. The court enjoined the Boston Store as prayed from disregarding the terms of the contract as to price maintenance. (225 Fed. Rep. 785.) On appeal the court below made the certificate previously stated and propounded four questions for our decision.

In a general sense the questions involve determining whether the right to make the price maintenance stipulation in the contract stated and the right to enforce it were secured by the patent law, and if not, whether it was valid under the general law, and was within the jurisdiction of the court on the one hand because of its authority to entertain suits under the patent law or its power on the other to exercise jurisdiction because of diversity of citizenship. We at once say, despite insistence in the argument to the contrary, that we are of opinion that there is no room for controversy concerning the subjects to which the questions relate, as every doctrine which is required to be decided in answering the questions is now

no longer open to dispute, as the result of prior decisions of this court, some of which were announced subsequent to the making of the certificate in this case. Under this situation our duty is limited to stating the results of the previous cases, to briefly noticing the contentions made in argument concerning the non-applicability of those results to the case in hand, and then to applying to the questions the indisputable principles controlling the subjects which the questions concern. As, however, the discharge of these duties as to each and all of the questions will require a consideration of the cases to be applied, it must result that if the questions be primarily considered separately, reiteration concerning the decided cases will inevitably take place. To avoid this redundancy of statement we therefore at once, as briefly as we may, state the adjudged cases which are applicable, in order that in the light afforded by one statement concerning them the questions may be considered and answered.

In *Bobbs-Merrill Co.* v. *Straus*, 210 U. S. 339, it was settled that the exclusive right to vend a copyrighted book given by the copyright law did not give to the owner of the copyright and book the right to sell for a price satisfactory to him and by a notice placed in the book fix a price below which it should not be sold by all those who might subsequently acquire it; and that, as such a right was not secured by the copyright law or the remedies which it afforded, a court of the United States had no jurisdiction to afford relief on the contrary theory.

In *Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373, it was decided that under the general law the owner of movables (in that case, proprietary medicines compounded by a secret formula) could not sell the movables and lawfully by contract fix a price at which the product should afterwards be sold, because to do so would be at one and the same time to sell and retain, to part with and yet to hold, to project the will of the seller so as to cause

it to control the movable parted with when it was. not subject to his will because owned by another, and thus to make the will of the seller unwarrantedly take the place of the law of the land as to such movables. It was decided that the power to make the limitation as to price for the future could not be exerted consistently with the prohibitions against restraint of trade and monopoly contained in the Anti-Trust Law.

In *Henry* v. *Dick Co.*, 224 U. S. 1, it was held that the owner of a patented machine (a rotary mimeograph) and the patents which covered it had, in selling the same, a right to contract with the purchaser not to use materials essential for working it unless bought from the seller of the machine, and to qualify the condition as a license of the use; that this right included the further right, by notice on the machine of the contract, to affect a third person who might deal with the purchaser with knowledge of the contract and notice so as to make him liable as a contributory infringer if he dealt with the buyer in violation of the terms of the notice. It was further decided that the right to make such contract arose from the right conferred by the patent law, and that jurisdiction to enforce it as against the contributory infringer existed under that law. At the time this case was decided there was one vacancy on the bench and one member of the court was absent. There was division, four members concurring in the ruling which the court made and three dissenting.

*Bauer* v. *O'Donnell*, 229 U. S. 1, again involved the right of a seller to impose a restraint on the price of future sales. It arose on a certificate from the Court of Appeals of the District of Columbia asking whether the right asserted was within the monopoly conferred by the patent law and whether, therefore, the duty to enforce it under that law obtained, and the power to give the remedy sought as a means of preventing an infringement of the

patent existed. Although pointing out that the restriction
on future price which the certificate stated was indisput-
ably void and unenforcible under the general law as the
result of the ruling in the *Miles Medical Case, supra,* it
was held that that ruling was not necessarily apposite,
because the certificate and the question presented re-
stricted the case to determining whether the right to limit
the price existed because within the monopoly granted by
the patent law, and whether the relief asked was within
the remedy which that law afforded. Considering the
case in that limited aspect, it was decided: (a) That the
exclusive right to vend given by the patent law had the
same significance which had been affixed to that word in
the copyright law in the *Bobbs-Merrill Case, supra.* (b)
That hence, when the holder of a patented article had
sold it, the article so sold passed out of the monopoly, and
the right to make future sales by one who bought it was
not embraced by the patent law and, consequently, that
law could not be extended so as to perpetuate its control
beyond the limits to which by the operation of law it
reached. In other words, the decision was that a patentee
could not use and exhaust the right to sell, as to which a
monopoly was given him by the patent law, and yet by
conditions and stipulations continue that law in effect so
as to make it govern things which by his voluntary act
were beyond its scope. And (c) that, as a result, where
an article had been sold and passed beyond the monopoly
given by the patent law, remedies on the theory of in-
fringement were not applicable to acts done which could
not have that character. It was hence answered that the
controversy and the remedies invoked were not within
the patent law. As the case dealt with the right to vend
under the patent law, the court reserved any express
statement concerning the scope of the right to use con-
ferred by that law.

In *Straus* v. *Victor Talking Machine Co.,* 243 U. S. 490,

the right to fix a permanent marketing price at which phonographs should be re-sold after they had been sold by the patentee was considered. Basing its action upon the substance of things, and disregarding mere forms of expression as to license, etc., the court held that the contract was obviously in substance like the one considered in the *Miles Medical Case* and not different from the one which had come under review in *Bauer* v. *O'Donnell*. Thus brushing away disguises resulting from forms of expression in the contract, and considering it in the light of the patent law, it was held that the attempt to regulate the future price or the future marketing of the patented article was not within the monopoly granted by the patent law, in accordance with the rule laid down in *Bauer* v. *O'Donnell*.

The general doctrines, although presented in a different aspect, were considered in *Motion Picture Patents Co.* v. *Universal Film Manufacturing Co.*, 243 U. S. 502. The scope of the case will be at once made manifest by the two questions which were certified for solution. "First. May a patentee or his assignee license another to manufacture and sell a patented machine and by a mere notice attached to it limit its use by the purchaser or by the purchaser's lessee, to films which are no part of the patented machine, and which are not patented? Second. May the assignee of a patent, which has licensed another to make and sell the machine covered by it, by a mere notice attached to such machine, limit the use of it by the purchaser or by the purchaser's lessee to terms not stated in the notice but which are to be fixed, after sale, by such assignee in its discretion?" The case therefore directly involved the general question of the power of the patentee to sell and yet, under the guise of license or otherwise, to put restrictions which in substance were repugnant to the rights which necessarily arose from the sale which was made. In other words, it required once again a consid-

eration of the doctrine which had been previously announced in *Henry* v. *Dick Co.* and of the significance of the monopoly of the right to use, conferred by the patent law, which had been reserved in *Bauer* v. *O'Donnell*. Comprehensively reviewing the subject, it was decided that the rulings in *Bauer* v. *O'Donnell* and *Straus* v. *Victor Talking Machine Co.* conflicted with the doctrine announced and the rights sustained in *Henry* v. *Dick Co.*, and that case was consequently overruled. Reiterating the ruling in the two last cases, it was again decided that, as by virtue of the patent law, one who had sold a patented machine and received the price, and had thus placed the machine so sold beyond the confines of the patent law, could not, by qualifying restrictions as to use, keep under the patent monopoly a subject to which the monopoly no longer applied.

Applying the cases thus reviewed, there can be no doubt that the alleged price-fixing contract disclosed in the certificate was contrary to the general law and void. There can be equally no doubt that the power to make it in derogation of the general law was not within the monopoly conferred by the patent law and that the attempt to enforce its apparent obligations under the guise of a patent infringement was not embraced within the remedies given for the protection of the rights which the patent law conferred.

Thus concluding, it becomes we think unnecessary to do more than say that we are of opinion that the attempt in argument to distinguish the cases by the assumption that they rested upon a mere question of the form of notice on the patented article, or the right to contract solely by reference to such notice, is devoid of merit, since the argument disregards the fundamental ground upon which, as we have seen, the decided cases must rest. Moreover, so far as the argument proceeds upon the assumption of the grave disaster which must come to the holders of pat-

ent rights and articles made under them from the future application of the doctrine which the cases establish, it must be apparent that if the forebodings are real the remedy for them is to be found, not in an attempt judicially to correct doctrines which by reiterated decisions have become conclusively fixed, but in invoking the curative power of legislation. In addition, through perhaps an abundance of precaution, we direct attention to the fact that nothing in the decided cases to which we have referred, having regard either to the application of the general law or of the patent law, deprives an inventor of any right coming within the patent monopoly, since the cases alone concerned whether the monopoly of the patent law can be extended beyond the scope of that law or, in other words, applied to articles after they have gone beyond its reach. The proposition so earnestly insisted upon, that, while this may be true, it does not fairly consider the reflex detriment to come to the rights of property of the inventor within the patent law as a result of not recognizing the right to continue to apply the patent law as to objects which have passed beyond its scope, is obviously not one susceptible of judicial cognizance. This must be, since whether, for the preservation of the rights which are within a law, its provisions should be extended to embrace things which it does not include, typically illustrates that which is exclusive of judicial power and within the scope of legislative action.

It remains, then, only to apply the principles established by the authorities which we have stated to the answers to the questions.

The first question is, "Does jurisdiction attach under the patent laws of the United States?" As we assume under the admissions of counsel that the bill asserted the existence of rights under the patent law, and as at the time it was filed the want of merit in such assertion had not been so conclusively settled as to cause it to be frivolous, we

are of opinion that the court had jurisdiction to pass upon the case as made by the bill, that is, to determine whether or not the suit arose under the patent law and hence as thus understood the question should be answered, yes.

Considering the second and third questions as virtually involving one consideration we state them together:

"2. If so, do the recited facts disclose that some right or privilege granted by the patent laws has been violated?

"3. Can a patentee, in connection with the act of delivering his patented article to another for a gross consideration then received, lawfully reserve by contract a part of his monopoly right to sell?"

Correcting their ambiguity of expression by treating the questions, as they must be treated, as resting upon and deducible from the facts stated in the certificate and therefore as embracing inquiries concerning the contract of sale containing the price maintenance stipulation, it follows from what we have said that the questins must be answered in the negative.

The final question is this:

"4. If jurisdiction attaches solely by reason of diversity of citizenship, do the recited facts constitute a cause of action?"

Upon the hypothesis which this question assumes there also can be no doubt that it must be answered in the negative.

The first question will be certified as answered yes, and the second, third and fourth as answered, no.

*And it is so ordered.*

MR. JUSTICE BRANDEIS, concurring.

Whether a producer of goods should be permitted to fix by contract, express or implied, the price at which the purchaser may resell them, and if so, under what conditions, is an economic question. To decide it wisely it is

necessary to consider the relevant facts, industrial and commercial, rather than established legal principles. On that question I have expressed elsewhere views which differ apparently from those entertained by a majority of my brethren. I concur, however, in the answers given herein to all the questions certified; because I consider that the series of cases referred to in the opinion settles the law for this court. If the rule so declared is believed to be harmful in its operation, the remedy may be found, as it has been sought, through application to the Congress or relief may possibly be given by the Federal Trade Commission which has also been applied to.

MR. JUSTICE HOLMES and MR. JUSTICE VAN DEVANTER are of opinion that each of the questions should be answered in the affirmative.